1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   CALIFORNIA FORESTRY ASSOCIATION          No. 2:05-cv-00905-MCE-GGH
     and AMERICAN FOREST & PAPER
12   ASSOCIATION,

13            Plaintiffs,

14        v.

15   DALE N. BOSWORTH, Chief, United          MEMORANDUM AND ORDER
     States Forest Service;
16   MIKE JOHANNS, Secretary.
     United States Department of
17   Agriculture; JACK A.BLACKWELL,
     Regional Forester, Pacific
18   Southwest Region,

19            Defendants.

20        and

21   SIERRA NEVADA FOREST PROTECTION
     CAMPAIGN, ET AL.
22
              Intervenor-Defendants.
23

24                              ----oo0oo----

25

26   ///

27   ///

28   ///

                                    1

1    Through this lawsuit, Plaintiffs California Forestry
2    Association and American Forest & Paper Association
3    ("Plaintiffs"), both timber and forest industry groups, challenge
4    the 2004 Sierra Nevada Forest Plan Amendment ("SNFPA"), commonly
5    known as the 2004 Framework, under various forest management
6    statutes, including the National Forest Management Act, 16 U.S.C.
7    § 1600, et seq. ("NFMA"), the Multiple-Use Sustained-Yield Act of
8    1960, 16 U.S.C. § 528, et seq., ("MUSYA"), the 1897 Organic
9    Administration Act, 16 U.S.C. § 473, et seq. ("Organic Act") and
10   the National Environmental Policy Act, 42 U.S.C. § 4231, et seq.
11   ("NEPA").  An independent claim under the Administrative
12   Procedures Act, 5 U.S.C. § 701, et seq. ("APA") is also asserted.
13   Plaintiffs raise both substantive and procedural claims asserting
14   that the logging and fuel treatments contemplated by the 2004
15   Framework fail to comply with these forest management guidelines.
16   Defendants are Dale Bosworth, the Chief of the United States
17   Forest Service, and several federal officials who had roles in
18   promulgating the 2004 Framework (hereinafter collectively
19   referred to as "Defendants").   Presently before the Court are
20   cross motions for summary judgment filed on behalf of both the
21   Plaintiffs and Defendants.

22

23                    **FACTUAL BACKGROUND**

24

25   The Sierra Nevada contains some 11.5 million acres of
26   National Forest Service land with eleven National Forests and
27   encompasses "dozens of complex ecosystems each with numerous,
28   inter-connected social, economic and ecological components."

2

SNFPA 1920.  In the late 1980s, the Forest Service began developing a comprehensive strategy for managing the myriad resources found within the region.  In 1995, the Regional Forester for the Pacific Southwest Region of the Forest Service issued a draft Environmental Impact Statement ("EIS") outlining its management proposal.  SNFPA 229.[1]

After extensive public participation and the preparation of a Final EIS ("FEIS") responding to public concerns, the Regional Forester issued, in 2001, a Record of Decision ("ROD") which adopted management objectives in five major areas: old forest ecosystems; aquatic, riparian, and meadow ecosystems; fire and fuels; noxious weeds; and hardwood ecosystems on the lower westside of the Sierras.  Id. at 231-35.  Among the thorniest issues confronted by the ROD was striking the appropriate balance between balancing the excessive fuel buildups occasioned by decades of fire repression and conserving key habitat for wildlife species dependent on old forest environments.  The 2001 ROD included a network of "old forest emphasis areas" across about 40 percent of all national forest land in the Sierra Nevada that was designed to provide a contiguous network of old forest ecosystems conducive to species preferring such habitat like the California spotted Owl, the American marten and the Pacific fisher.  SNFPA 236.

///

///

///

_____

[1] Documents found within the first eight-volume record are cited as SNFPA, followed by the Bates-stamp number.

Aside from other areas slated for specific treatment (like a limited "urban wildland intermix" designed to create a buffer between developed areas and the forest), the 2001 Framework specified a "general forest" land allocation intended to increase the density of large old trees and the continuity and distribution of old forests across the landscape. SNFPA 236-37.

In order to protect old forest conditions within its specific areas of emphasis, the 2001 Framework generally prohibited logging that would remove trees over 12 inches in diameter or logging that would reduce canopy cover by more than 10 percent. SNFPA 328. Even within the "general forest" areas, the 2001 Framework prohibited logging of trees over 20 inches in diameter. SNFPA 336. It was only within the intermix zones that no canopy restrictions were imposed and logging of trees up to 30 inches was permitted. SNFPA 333, 315.

Although the Forest Service ultimately affirmed adoption of the 2001 ROD despite receipt of approximately 200 administrative appeals, it nonetheless directed the Regional Forester to conduct an additional review with respect to specific concerns like wildfire risk and the Forest Service's responsibilities under the Herger-Feinstein Quincy Library Group Forest Recovery Act ("HFQLG Act"), a congressional mandate which established a Pilot Program for fire suppression through a combination of fire breaks, group selection logging and individual logging. SNFPA 1918. A management review team was assembled by the Regional Forester for this purpose.

///

///

1    In March 2003, the team concluded that the 2001 ROD's
2  "cautious approach" to active fuels management had limited its
3  effectiveness in many treatment areas.  The management review
4  team further found that revisions to vegetation management rules
5  would decrease flammable fuels while protecting critical wildlife
6  habitat by guarding against the risk of stand-replacing wildfire.
7  See SNFPA 1918, 1926.  Moreover, with respect to the California
8  spotted owl ("CASPO" or "owl"), the team felt that the 2001 ROD
9  had unnecessarily "took a worst case approach to estimating
10  effects" on the owl.  SNFPA 1968.[2]  In addition to citing recent
11  research indicating that habitat losses resulting from fuel
12  treatments were less than previously believed, the team further
13  found that the 2001 ROD's extensive reliance on maintaining
14  extensive canopy cover was impracticable to implement.

15    Following receipt of the team's findings, the Regional
16  Forester ordered that management strategy alternatives in
17  addition to those considered in the 2001 FEIS be considered.  A
18  draft supplemental environmental impact statement ("DSEIS"),
19  tiered to the 2001 EIS, was thereafter released to the public in
20  January 2004.

21  ///

22  ///

23  _____

24    [2] The 2001 Framework's CASPO analysis was largely predicated
25  on a July 1992 report (the "CASPO Report") that recommended
    establishment of a 300-acre Protected Activity Center ("PAC")
26  around all known owl nest sites, a complete prohibition of
    logging within the PACs, more limited logging prohibition of
    trees over 30 inches in diameter in all habitat suitable for owl
27  nesting and foraging, and a prohibition on logging that would
    reduce canopy cover below 40 percent in owl nesting habitat.
28  SNFPA 1037-40.

1   While the same five areas of concern were targeted in the DSEIS

2   as in its 2001 predecessor, in 2004 a new action alternative was

3   identified (Alternative S2), in addition to the alternative

4   selected by the 2001 Framework (Alternative S1) and the seven

5   alternatives that had previously been considered before adoption

6   of the 2001 Framework (Alternatives F2-F8).[3]   Following the

7   public comment period after dissemination of the DSEIS, the SEIS

8   in final form also included response to various issues raised,

9   including comments by the United States Fish and Wildlife

10  Service, by the United States Environmental Protection Agency, by

11  California resources protection agencies, and by the Science

12  Consistency Review ("SCR") team.[4]

13      By adopting the SEIS on January 21, 2004, the Regional

14  Forester replaced the 2001 ROD with its 2004 successor and

15  amended the forest plans for all eleven national forests situated

16  in the Sierra Nevada.  SNFPA 2987-3061.  The 2004 ROD reasoned

17  that the 2001 Framework "prescribed technical solutions that do

18  not produce needed results, or offered methods we often dare not

19  attempt in the current Sierra Nevada."  SNFPA 2995.  The 2004

20  Framework reasoned that the methods as adopted in 2001 fail to

21  reverse the damage, and growing threat, of catastrophic fires

22  quickly enough.  Id.

23  _____

24      [3] The DSEIS also considered seven additional alternatives in
    addition to those considered in detail but eliminated the seven
25  from extensive consideration because they were found to be
    inconsistent with the purpose and need of the DSEIS.  SNFPA 3163-
26  65.

27      [4] The SCR consisted of eleven scientists convened by the
    Pacific Southwest Research Station in Davis, California, and
28  included experts in fire and fuels management, forest ecology,
    and species viability.  SNFPA 3503.

1   Consequently fuels treatment contemplated under the 2004

2   Framework increased from the figures envisioned by its 2001

3   predecessor.  Average annual sawtimber harvest under the selected

4   alternative (S2) increased from 118 million board feet ("mmbf")

5   under the 2001 Framework to 458 mmbf during the first five years

6   following implementation of the 2004 Framework.  Figures during

7   the second five years also increased (from 82 to to 371 mmbf).

8       The Chief of the Forestry Service ultimately affirmed the

9   2004 ROD,[5] with the direction that details of the ROD's adaptive

10  management be submitted to him within six months.  SNFPA 3997-

11  4305.  The Regional Forester submitted that supplemental

12  information to the Chief on March 31, 2005.

13      Through the present lawsuit, Plaintiffs allege that the 2004

14  Framework is flawed because it impermissibly favors the

15  management of forests for individual species and old-growth

16  habitat over treatments designed to reduce unnaturally-high fuels

17  levels and to produce commercial timber.

18

19                          **PROCEDURAL FRAMEWORK**

20

21      Congress enacted NEPA in 1969 to protect the environment by

22  requiring certain procedural safeguards before an agency takes

23  action affecting the environment.

24  ///

25  ///

26

27      [5] In so affirming, Forest Service Chief Dale Bosworth denied
    6,241 separate administrative appeals of the 2004 Framework.
28  SNFPA 3998.

The NEPA process is designed to "ensure that the agency ... will
have detailed information concerning significant environmental
impacts; it also guarantees that the relevant information will be
made available to the larger [public] audience."  Blue Mountains
Biodiversity Project v. Blackwood, 171 F.3d 1208, 121 (9th Cir.
1998).  The purpose of NEPA is to "ensure a process, not to
ensure any result."  Id.  "NEPA emphasizes the importance of
coherent and comprehensive up-front environmental analysis to
ensure informed decision-making to the end that the agency will
not act on incomplete information, only to regret its decision
after is it too late to correct."  Center for Biological
Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir.
2003).  Complete analysis under NEPA also assures that the public
has sufficient information to challenge the agency's decision.
Robertson v. Methow Valley Citizens, 490 U.S. 332, 349 (1989);
Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1151 (9th Cir.
1998).

NEPA requires that all federal agencies, including the
Forest Service, prepare a "detailed statement" that discusses the
environmental ramifications, and alternatives, to all "major
Federal Actions significantly affecting the quality of the human
environment."  42 U.S.C. § 4332(2)(c).  An agency must take a
"hard look" at the consequences, environmental impacts, and
adverse environmental effects of a proposed action within an
environmental impact statement ("EIS"), when required.  Kleppe v.
Sierra Club, 427 U.S. 390, 410, n.21 (1976).

///

///

1    Given its status as a statutory scheme safeguarding

2    procedure rather than substance,[6] NEPA does not mandate that an

3    EIS be based on a particular scientific methodology, nor does it

4    require a reviewing court to weigh conflicting scientific data.

5    Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986

6    (9th Cir. 1985).  An agency must be permitted discretion in

7    relying on the reasonable opinions of its own qualified experts,

8    even if the court might find contrary views more persuasive.  See,

9    e.g., Kleppe, 427 U.S. at 420, n. 21.  NEPA does not allow an

10   agency to rely on the conclusions and opinions of its staff,

11   however, without providing both supporting analysis and data.

12   Idaho Sporting Cong., 137 F.3d at 1150.  Credible scientific

13   evidence that contraindicates a proposed action must be evaluated

14   and disclosed.  40 C.F.R. § 1502.9(b).

15       In addition to arguing that the Forest Service violated NEPA

16   in this case, Plaintiffs also contend that the 2004 Framework

17   violates several substantive forest management statutes.  First,

18   they point to the NFMA, which requires that "resource plans and

19   permits, contracts, and other instruments for the use and

20   occupancy of National Forest Systems lands shall be consistent

21   with the land management plans."  16 U.S.C. § 1604(i).

22   ///

23   ///

24   ///

25

26       [6] The National Forestry Management Act ("NFMA"), 16 U.S.C.
     § 1600 et seq, provides for substantive, as opposed to procedural
27   protection with regard to actions that affect the environment.
     Plaintiffs have not alleged any violation of the NFMA through
28   this lawsuit.

Consequently, all activities in Forest Service forests, including timber projects, must be determined to be consistent with the governing forest plan, which is a broad, programmatic planning document.  See, e.g., Wilderness Society v. Thomas, 188 F.3d 1130, 1132 (9th Cir. 1999).  If an EA or EIS adequately discloses such effects, that goal is satisfied.  Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996) (emphasis in original).

Secondly, Plaintiffs cite the provisions of the 1897 Organic Act, which entrusted the Forest Service with sweeping authority to "make such rules and regulations and establish such service as will insure the objectives of the [national forests], namely to regulate their occupancy and preserve the forests thereon from destruction."  16 U.S.C. § 551.  This broad delegation of authority sweepingly instructs the Secretary of Agriculture to "make provisions for the protection against destruction by fire and depredations upon the public forests and national forests" (Id.), and contains a statement that forests should "furnish a continuous supply of timber for the use and necessities of citizens of the United States."  16 U.S.C. § 475.

Plaintiffs also invoke the guidelines of the Multiple-Use Sustained Yield Act of 1960 ("MUSYA"), a general statute that requires the Forest Service to consider competing potential uses for forest resources like those required by outdoor recreation, range, timber, watershed, and fish and wildlife needs.  16 U.S.C. § 528; see Wind River Multiple-Use Advocates v. Espy, 835 F. Supp. 1362, 1372-73 (D. Wyo. 1993); aff'd 85 F.3d 641 (10th Cir. 1996).

The MUSYA concept of multiple use gives the Forest Service broad discretion in determining the proper mix of forest resources to be utilized.  Intermountain Forest Ass'n v. Lyng, 683 F. Supp. 1330, 1337-38 (D. Wyo. 1988) (Forest Service need only consider various uses; MUSYA does not direct how such uses should be allocated).  Therefore, while MUSYA voices general principles for use management, it imposes few, if any, judicially reviewable constraints on the Forest Service's exercise of its discretion. Perkins v. Bergland, 608 F.2d 803, 806 (9th Cir. 1979) (MUSYA contains "the most general clauses and phrases" that "can hardly be considered concrete limits upon agency discretion.  Rather, it is language that 'breathe(s) discretion at every pore.'") (internal citation omitted).  The NFMA expressly incorporates the principles of the MUSYA for development of forest plans. 16 U.S.C. § 1604(e)(1) (forest plans are to "provide for multiple use and sustained yield of the products and services obtained therefrom" in accordance with MUSYA); see also Sierra Club v. Espy, 38 F.3d 792, 795 (5th Cir. 1994) (principles of MUSYA "incorporated into the statutory and regulatory scheme of NFMA"). Compliance with NFMA will therefore satisfy the requirements of the MUSYA, as both statutes grant the agency similar discretion. See Oregon Natural Resources Council v. Lowe, 836 F. Supp. 727, 733 (D. Or. 1993).

///

///

///

///

///

1    Because neither NEPA nor NFMA contains provisions allowing a

2    private right of action (see Lujan v. National Wildlife

3    Federation, 497 U.S. 871, 882 (1990) and Ecology Center Inc. v.

4    United States, 192 F.3d 922, 924 (9th Cir. 1999) for this

5    proposition under NEPA and NFMA, respectively), a party can

6    obtain judicial review of alleged violations of NEPA only under

7    the waiver of sovereign immunity contained within the

8    Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Earth

9    Island Institute v. U.S. Forest Serv., 351 F.3d 1291, 1300 (9th

10   Cir. 2005).

11   Under the APA, the court must determine whether, based on a

12   review of the agency's administrative record, agency action was

13   "arbitrary and capricious," outside the scope of the agency's

14   statutory authority, or otherwise not in accordance with the law.

15   Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356

16   (9th Cir. 1994).  However, the court may not substitute its own

17   judgment for that of the agency.  Id. (citing Citizens to

18   Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971),

19   overruled on other grounds by Califano v. Sanders, 430 U.S. 99

20   (1977)).

21   In reviewing an agency's actions, then, the standard to be

22   employed is decidedly deferential to the agency's expertise.

23   Salmon River, 32 F.3d at 1356.  Although the scope of review for

24   agency action is accordingly limited, such action is not

25   unimpeachable.  The reviewing court must determine whether there

26   is a rational connection between the facts and resulting judgment

27   so as to support the agency's determination.

28   ///

1 Baltimore Gas and Elec. v. NRDC, 462 U.S. 87, 105-06 (1983),

2 citing Bowman Trans. Inc. v. Arkansas-Best Freight Sys. Inc., 419

3 U.S. 281, 285-86 (1974).  An agency's review is arbitrary and

4 capricious if it fails to consider important aspects of the

5 issues before it, if it supports its decisions with explanations

6 contrary to the evidence, or if its decision is either inherently

7 implausible or contrary to governing law.  The Lands Council v.

8 Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).

9

10                              **STANDARD**

11

12      Summary judgment is an appropriate procedure in reviewing

13 agency decisions under the dictates of the APA.  See, e.g.,

14 Northwest Motorcycle Assn. v. U.S. Dept. Of Agric., 18 F.3d 1468,

15 1471-72 (9th Cir. 1994).  Under Federal Rule of Civil Procedure

16 56, summary judgment may accordingly be had where, viewing the

17 evidence and the inferences arising therefrom in favor of the

18 nonmovant, there are no genuine issues of material fact in

19 dispute."  Id. at 1472.  In cases involving agency action,

20 however, the court's task "is not to resolve contested facts

21 questions which may exist in the underlying administrative

22 record", but rather to determine whether the agency decision was

23 arbitrary and capricious as defined by the APA and discussed

24 above.  Gilbert Equipment Co., Inc. v. Higgins, 709 F. Supp.

25 1071, 1077 (S.D. Ala. 1989); aff'd, Gilbert Equipment Co. Inc. v.

26 Higgins, 894 F.2d 412 (11th Cir. 1990); see also Occidental Eng'q

27 Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).

28 ///

Consequently, in reviewing an agency decision, the court must be "searching and careful" in ensuring that the agency has taken a "hard look" at the environmental consequences of its proposed action.  Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 858-59 (9th Cir. 2005);  Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

**ANALYSIS**

**I.  CLAIMS UNDER THE ORGANIC ACT, MUSYA AND NFMA**

As an initial matter, Defendant-Intervenor Pacific Rivers Council, citing Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 732-37 (1998), claim that challenges under these forest management statutes are not yet ripe for adjudication because they are challenges to a general forest management plan unrelated to any site-specific or concrete harm.  Pacific Rivers alleges that Plaintiffs fail to articulate any imminent injuries occasioned by adoption of the 2004 Framework.  Plaintiffs disagree, contending that their allegations that adequate timber harvesting will not occur under the 2004 Framework is not subject to review in a later, site-specific decision.  They correctly point out that even Ohio Forestry envisioned a different result if a plaintiff could show current hardship apart from any subsequent site-specific implementation.  In that instance, the Supreme Court implied that a challenge could be "immediately justiciable".  Id. at 738-39.

///

///

///

14

Given Plaintiffs' allegations that the failure to sufficiently address forest overgrowth conditions through logging and other treatment means will immediately effect its members both economically and environmentally, the Court believes that their claims under these forest management statutes are indeed ripe.  We now move to address the substance of those claims.

**A.   Because the 2004 Framework Complies with the Forest Management Statutes by Appropriately Balancing Resources Use, Defendants are Entitled to Summary Judgment on Plaintiffs' First Claim.**

In its First Cause of Action, Plaintiffs allege that the 2004 Framework substantively violates The NFMA, MUSYA and the Organic Act by unlawfully favoring wildlife protection over timber harvest needs.  See Pls.' Am. Compl., ¶ 22.  According to Plaintiffs, implementing that emphasis, and preventing adequate fuels reduction treatments, has caused forest health to deteriorate, thereby creating the potential for large ecosystem collapses by allowing overly-dense forests to deteriorate to the extent that they are subject to destruction by fire, drought, insect infestations, and/or tree diseases.

Plaintiffs initially point to the language of the 1897 Organic Act to support their contention that timber interests have paramount performance.  They particularly emphasize provisions of that Act which require national forests to "furnish a continuous supply of timber for the use and necessities of citizens of the United States."  16 U.S.C. § 475.

///

///

15

1  Plaintiffs ignore the fact, however, that both MUSYA and NFMA
2  expanded the purposes for which national forest lands must be
3  managed and expressly directed that other purposes be considered.
4  16 U.S.C. 528; Intermountain Forest Indus. Ass'n v. Lyng, 683 F.
5  Supp. at 1337 ("Arguing that the Organic Act requires the Forest
6  Service to manage national forests primarily for the production
7  of timber and for the protection of watershed ignores the
8  Multiple-Use Sustained-Yield Act of 1960"; MUSYA gives range,
9  recreation and wildlife an equal footing with timber
10 production"); California v. Block, 690 F.2d 753, 757 n.2 (9th
11 Cir. 1982 (Organic Act supplemented by MUSYA).  Indeed, emphasis
12 on the Organic Act's reference to furnishing timber, to the
13 exclusion of other forest uses, has been specifically rejected.
14 Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1315 (W.D.
15 Wash. 1994, aff'd sub nom Seattle Audubon Soc'y v. Moseley, 80
16 F.3d 1401 (9th Cir. 1996) (claim that a region-wide amendment
17 violated 16 U.S.C. § 475 has no merit, because the Organic Act
18 "does not provide an exhaustive list of forest uses").[7]

19     MUSYA provides only that "due consideration shall be given
20 to the relatives values of the various resources in particular
21 areas."  16 U.S.C. 529.  The concept of "due consideration" has
22 been interpreted very broadly.

23 _____

24      [7] Although Plaintiffs rely on the Supreme Court's decision
   in United States v. New Mexico, 438 U.S. 696 (1978) for the
25 proposition that timber production's interest in forest
   management is paramount, that case is distinguishable because it
26 involved a highly specific inquiry into Congress' intent to
   reserve water rights, as opposed to the general management of
27 forest service lands involved here.  Significantly, in County of
   Okanogan v. Nat'l Marine Fisheries Serv., 347 F.3d 1081, 1086
28 (9th Cir. 2003), the Ninth Circuit limited the holding of New
   Mexico to water rights.

1   Perkins v. Bergland, 608 F.2s 803, 806 (9th Cir. 1979).  Indeed

2   the general directives of MUSYA "breathe discretion at every

3   pore."  Strickland v. Morton, 519 F.2d 467, 469 (9th Cir. 1975).

4        In The Lands Council v. McNair, 537 F.3d 981 (9th Cir.

5   2008), the Ninth Circuit recently reiterated that "Congress'

6   current vision of national forest uses, a broader view than

7   Congress articulated in [the 1897 Organic Act] is expressed in

8   the Multiple-Use Sustained-Yield act of 1960", which directed

9   that forests "be administered for outdoor recreation, range,

10  timber, watershed, and wildlife and fish purposes."  Id. at 990.

11  Hence Plaintiffs are incorrect in relying upon the Organic Act as

12  supporting any preeminence for timber interests within these

13  competing multiple-use considerations.

14       Consistent with the provisions of MUSYA which, as indicated

15  above, are also incorporated within the statutory and regulatory

16  scheme of the NFMA (Sierra Club v. Espy, 38 F.3d at 795), the

17  Forest Service has broad discretion to determine the combination

18  of uses that best promotes forest health.  See Perkins v.

19  Bergland, 608 F.2d 803, 806-07; Sierra Club v. Marita, 843 F.

20  Supp. 1526, 1540 (E.D. Wis. 1994).  The legislative history of

21  the NFMA shows that, by granting such discretion, Congress wanted

22  to avoid prescribing any particular forest management practices

23  or resource priorities by statute, instead leaving such decisions

24  to the Forest Service.

25  ///

26  ///

27  ///

28  ///

17

1   <u>See</u> Compilation of the Forest and Range Renewable Resource Act of

2   1974, Committee on Agriculture, Nutrition and Forestry, U.S.

3   Senate, 96th Cong., 1st Sess. at 790 ("RPA Compilation") at 671

4   ("if we are locked into an inflexible guideline by prescription

5   from the Congress, then we are not allowing the forest

6   professionals to practice forestry in the forests") (remarks of

7   Rep. Symms).

8        The 2004 Framework is a reasonable exercise of the

9   discretion afforded the Forest Service by the combined multiple-

10  use provisions of the Organic Act, MUSYA and the NFMA.  The

11  record demonstrates that the Regional Forester considered and

12  balanced numerous considerations, including wildlife (SNFPA 3264-

13  49); fuels reduction to facilitate fire-fighting and to protect

14  communities (SNFPA 3202-3204); and commercial forest products,

15  especially in the HFQLG Pilot Project area and the Big Valley

16  Sustained Yield Unit of the Modoc National Forest, where timber

17  production is considered both as a by-product of fuel treatments

18  and as a regulated commodity.  <u>See, e.g.</u>, SNFPA 3243-47, 3386-

19  3392.  The Regional Forester concluded that the 2004 Framework

20  improved upon its 2001 predecessor by representing "a better

21  balance... between the production of timber, grazing, and other

22  resources and the long-term protection and restoration of the

23  environment."  SNFPA 4057.

24  ///

25  ///

26  ///

27  ///

28  ///

18

1    As indicated above, the 2004 Framework actually represents a

2   considerable increase in timber production over the 2001

3   Framework.  In fact, as the Forest Service points out, timber

4   harvest contemplated by the 2004 Framework is actually some 85

5   percent of the levels permitted by the individual forest plans in

6   place prior to adoption of the 2001 Framework.  SNFPA 3391.

7   Substantial timber harvest is permitted on over a million acres

8   as part of the HFQLG and Modoc National Forest projects.  SNFPA

9   3386, SNFPA 986 (HFQLG FEIS at 2-3).  By no means has commercial

10  timber harvest been eliminated.

11   Although Plaintiffs claim that the 2004 Framework does not

12  go far enough in reducing dangerously overloaded fuel loads in

13  the Sierra Nevada, and consequently fails to reduce the risk of

14  catastrophic fire fast enough, the SEIS makes it clear that

15  treating the entire 8 million acres in vegetation classes with a

16  moderate to high risk of wildland fire is "practically

17  impossible".  SNFPA 3289.  Given that inherent limitation, the

18  2004 Framework takes a reasonable approach in initially

19  attempting to aggressively treat areas around communities and

20  structures in a land use classification known as the Wildland

21  Urban Intermix ("WUI").  See SNFPA 2995 ("My first emphasis is on

22  reducing fuels in the [WUI]"); SNFPA 3289.  In addition to this

23  attempt to reduce fire risk around populated areas, the Framework

24  also envisions a system of strategically placed area treatments

25  across the landscape to reduce fire risk in other areas as well.

26  See SNFPA 2998 (describing thinnings that would occur outside the

27  aforementioned defense zones).

28  ///

This strategy for reducing fire risk is well within the Forest Service's discretion in attempting to deal not only with fire danger but also the myriad of other competing forest interests that must necessarily be weighed.

While Plaintiffs argue that timber harvesting is not spread across the entire eleven national forests comprising the Sierra Nevada and instead is largely confined to particular areas, there is no requirement that use considerations be evenly distributed. See Wind River Multiple-Use Advocates v. Espy, 835 F. Supp. at 1372 ("the MUSYA does not contemplate that every acre of National Forest be managed for every multiple use"); Big Hole Ranchers Ass'n Inc v. U.S. Forest Serv., 686 F. Supp. 256, 264 (D. Mont. 1988) ("The Forest Service has wide discretion to weigh and decide the proper uses within any area.").

Contrary to Plaintiffs' contention, there also is no mandate that regional forest plans, like the 2004 Framework, determine particular forest harvesting levels under 16 U.S.C. § 1604(e)(2) First, there is no fundamental entitlement to timber production on forest lands. California Forestry Ass'n v. Thomas, 936 F. Supp. 13, 18 (D.D.C. 1996) ("[T]he Department of Agriculture retains full authority to determine the quantity of timber it will allow to be sold, if any, from the National Forests") (emphasis added; Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1233 (D.C. Cir. 1996) (holding that federal timber contracts are not a required right); Intermountain Forest Industry Ass'n v. Lyng, 683 F. Supp. at 1340 (no right to harvest timber "is conferred by statute or regulation").

///

1   Secondly, while Plaintiffs rely extensively on the failure

2   of the Framework to establish allowable sale quantities ("ASQ")

3   for each of the eleven forests falling within auspices of the

4   2004 Framework, and claim that such failure runs afoul of NFMA

5   requirements, the ASQ is a ceiling, and not a quota on harvesting

6   as Plaintiffs appear to allege.  See Ohio Forestry, 523 U.S. at

7   729 (forest plan "sets a ceiling on the total amount of wood that

8   can be cut"); Swan View Coalition v. Turner, 824 F. Supp. 923,

9   935 (D. Mont. 1992) (stating that ASQ objectives "simply

10  represent a ceiling on timber production and do not mandate that

11  such quantities actually be harvested"); Alcock, 779 F. Supp. At

12  1361-62 n.7 (ASQ is "merely a ceiling").

13  Moreover, and in any event, the 2004 Framework does not

14  amend the ASQ or alter the scheduling of regulated timber

15  harvest.  See SNFPA 2999 (decision does not schedule any

16  regulated timber harvest" from forest lands); SNFPA 3005.

17  Instead, the 2004 Framework lawfully decided that the scheduling

18  of regulated timber harvest and its associated ASQ should be

19  addressed within individual forest plans.  SNFPA 2999

20  ("Scheduling regulated timber harvest and the associated [ASQ] is

21  part of the land and resource management planning process and

22  will be addressed in individual forest plan revisions"); SNFPA

23  4076.  Caselaw permits such deferral.  See Wilderness Soc'y v.

24  Bosworth, 118 F. Supp. 2d 1082, 1111 n.36 (D. Mont. 2000) (an

25  agency's decision to postpone revisions to the forest plan is a

26  proper exercise of discretion).

27  ///

28  ///

21

1    Plaintiffs make a related argument by claiming that in

2    addition to failing to establish ASQs, the Forest Service also

3    neglected its duties under the NFMA by failing to designate lands

4    deemed unsuitable for timber harvesting as required by 16 U.S.C.

5    § 1604(k).  Although this argument presupposes that re-

6    categorization of lands in fact has occurred, nothing in the 2004

7    Framework in fact changes any land allocation or timber base.

8    The record states that the Framework "does not change the

9    capable, available, and suitable timber land determinations made

10   in individual forest plans."  SNFPA 2999.

11   Because there are no changes in land classifications, there

12   is no requirement for redesignation in the Framework.  See Am.

13   Forest Res. Council v. Conroy, 2005 WL 771577 at *6 (D. Or.

14   2005).  The fact that the 2004 Framework may have set aside

15   certain forest acreage for wildlife habitat does not amount to a

16   de facto redesignation; there has been no finding that such

17   acreage will indefinitely remain unsuitable for timber.  See id.

18   Additionally, in developing forest plan alternatives, the Forest

19   Service is allowed to depart in any event from principles

20   governing regulated timber harvest when it is "reasonable to

21   expect that overall multiple-use objectives would otherwise be

22   better attained."  36 C.F.R. 219.16(a)(3)(iv) (2000).

23   In sum, the forest management statutes create no entitlement

24   to timber harvest, and instead give the Forest Service broad

25   discretion in determining the appropriate balance of multiple

26   resource uses.  The 2004 Framework is a reasonable exercise of

27   that discretion and must be upheld.

28   ///

22

1 Defendants are accordingly entitled to summary adjudication as to

2 Plaintiffs' First Cause of Action.

3

4     **B.   Defendants are Entitled to Summary Judgment on**
            **Plaintiffs' Challenges to the 1982 Regulations**

5             **Implementing NFMA.**

6

7     In addition to claiming the 2004 Framework improperly

8 reverses the resource priority envisioned by the forest

9 management statutes, Plaintiffs also contend that the 1982 NFMA

10 regulations (under which the Framework was prepared) fail on the

11 same grounds.  Plaintiffs' argument in that regard is no more

12 successful.

13     First, although the 1982 Regulations are no longer in

14 effect, having been supplanted by new rules in 2005, the

15 transitional regulations in effect when the Forest Service

16 proposed and adopted the 2004 Framework permitted the Forest

17 Service to use the 1982 Regulations in preparing the plan

18 amendment, and it did so.  SNFPA 4055-4056; <u>see</u> 36 C.F.R. 219.35

19 (2004); 67 Fed. Reg. 35,431, 35,434 (May 20, 2002).  The Ninth

20 Circuit has also confirmed that the 1982 regulations apply to the

21 2004 Framework.  In <u>Natural Res. Def. Council v. Forest Serv.</u>,

22 421 F.3d 797, 800 n.3 (9th Cir. 2005, the court applied the 1982

23 regulations in reviewing the forest plan, for the Tongass

24 National Forest, a programmatic document similar to the 2004

25 Framework at issue here.

26 ///

27 ///

28 ///

More recently, in Earth Island Institute v. U.S. Forest Serv.,
442 F.3d 1147, 1153 (9th Cir. 2006), the Ninth Circuit stated
unequivocally that "we conclude the NFMA regulations in 1982
apply to the 2001 Framework and 2004 Supplement."

Plaintiffs take aim here at 36 C.F.R. § 219.19, a provision
in the 1982 regulations which required that fish and wildlife
habitat be managed to maintain viable populations of the existing
native and desired non-native species in the planning area.
Plaintiffs claim that application of § 219.19 to the 2004
Framework produced "extraordinary" land allocations and
management constraints for individual species like the California
spotted owl, the willow flycatcher and the American fisher.
Pls.' Mem. in Support of Mot. for Summ. J., 23:13-16.  Plaintiffs
claim that this "species viability" rule resulted in a preference
over timber production and forest health concerns that is contrary
to the multiple-use mandates of the forest management statutes.

Plaintiffs' arguments fail because the 1982 regulations, and
particularly § 219.19, are a reasonable interpretation of the
NFMA's ambiguous directive to "provide for diversity" in light of
other multiple use objectives.  16 U.S.C. § 1604(g)(3)(b); see
Chevron USA, Inc. v. Natural Res. Def. Council, 467 U.S. 837
(upholding agency's interpretation as reasonable).  Although
Congress did not define "diversity" within the NFMA or explain
how to comply with its expressed desire to facilitate the
concept, the 1982 regulations reasonably attempted to facilitate
diversity both through habitat identification and the selection
of certain species upon which habitat effects could best be
evaluated (the so-called management indicator species, or "MIS").

24

1    Contrary to Plaintiffs' contention, § 219.19 of the 1982

2 regulations is not an attempt to always let wildlife concerns

3 prevail over timber uses and considerations of forest health.

4 Rather, it is a flexible directive designed to ensure that

5 habitat issues, as well as other multiple-use factors, are

6 properly taken into account.  That interpretation is borne out by

7 a caveat in the statute itself that habitat shall be selected "to

8 the degree consistent with overall multiple use objectives".  36

9 C.F.R. § 219.19(a).

10    Significantly, the courts have already considered and

11 rejected Plaintiffs' argument; namely, "that the [viability]

12 regulation is invalid under the multi-use provisions of MUSYA and

13 NFMA."  <u>Seattle Audubon Soc'y v. Lyons</u>, 871 F. Supp. 1291, 1315

14 (W.D. Wash 1994); <u>aff'd sub nom</u> <u>Seattle Audubon Soc'y v. Moseley</u>,

15 80 F.3d 1401 (9th Cir. 1996).  "[T]he regulation makes clear that

16 planning for species diversity occurs with multiple use

17 principles in mind."  <u>Id</u>. at 1316.  <u>See also</u> <u>Seattle Audubon Soc.</u>

18 <u>v. Moseley</u>, 798 F. Supp. 1484, 1489 (W.D. Wash. 1992); aff'd 998

19 F.2d 699 (9th Cir. 1993) (finding that the underlying NFMA

20 statute (16 U.S.C. 1604(g)(3)(B)) simply "requires Forest Service

21 planners to treat the wildlife resource as a controlling, co-

22 equal factor in forest management....").

23    Given this authority, and the flexible approach to § 219.19

24 also advocated by the Forest Service, Plaintiffs have conceded

25 their "facial" challenge to the statute fails and should be

26 dismissed.  <u>See</u> Pls.' Opp. to Defs.' Mot. for Summ. J., 5:11-13;

27 8:16-18.

28 ///

25

Plaintiffs nonetheless persist in arguing that § 219.19, "as applied" to the 2004 Framework, creates a dominance for viable wildlife populations that runs counter to NFMA, MUSYA, and the Organic Act.  Plaintiffs claim that this purported hierarchy, which provided at minimum a "beginning constraint" for development of the Framework, is improper.  As an example of a result colored by such hierarchy, Plaintiffs point to the acreage allocated to species habitat within the Framework.

This argument fails for the same reason that Plaintiff's overall challenge to the 2004 Framework, on grounds that it contravened the forest management statutes, was rejected by the Court as discussed above.  First, the statutes themselves create no priority for timber over any other competing use, including those entailed by wildlife.  It would be unprecedented for this Court to subordinate wildlife protection and declare logging the dominant forest use, as Plaintiffs appear to request. Secondly, examination of the Framework shows that multiple use considerations were properly weighed in accordance with the Forest Service's considerable discretion in deciding how to best accommodate those considerations.

**II.  NEPA CLAIMS.**

As a preliminary matter, Intervenor Defendant Pacific Rivers Council argues that neither Plaintiffs or their members have standing to challenge the 2004 Framework's proposal for handling forest timber supply because they have not demonstrated any injury in fact related to that handling.

26

1  In order to satisfy Article III's standing requirements a

2  plaintiff must show that "(1) it has suffered an injury in fact

3  that is (a) concrete and particularized and (b) actual or

4  imminent, not conjectural or hypothetical; (2) the injury is

5  fairly traceable to the challenged action of the defendant; and

6  (3) it is likely, as opposed to merely speculative, that the

7  injury will be redressed by a favorable decision."  Friends of

8  the Earth, Inc. v. Laidlaw Envtl. Serv., 528 U.S. 167, 180-81

9  (2000).

10      Pacific Rivers argues no standing is present under this

11  standard because the interests Plaintiffs invoke are purely

12  economic, as opposed to environmental, and consequently to not

13  fall within the zone of interests protected by NEPA.  Ashley

14  Creek Phosphate Co. v. Norton, 420 F.3d 934, 944-45 (9th Cir.

15  2005).

16      After examining Plaintiffs' various contention, the Court

17  believes, however, that standing is in fact present.  Courts have

18  held that governmental action constricting timber supply inflicts

19  the constitutionally necessary injury for purposes of NEPA.

20  Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1233

21  (D.C. Cir. 1996).  Moreover, Plaintiffs unquestionably cite

22  interests of forest health in the Framework's alleged failure to

23  adequate thin overdense national forests– a factor they claim

24  poses imminent risk to privately owned forestland adjacent to the

25  federally owned property.

26  ///

27  ///

28  ///

27

1   The Ninth Circuit has held that a plaintiff is cloaked with
2   standing under NEPA, even if its interest is primarily economic,
3   if it has "also alleged an environmental interest or economic
4   injuries that are causally related to an act within NEPA's
5   embrace." Ranchers Cattlemen Action Legal Found. v. U.S. Dep't
6   of Agric., 415 F.3d 1078, 1103 (9th Cir. 2005) (internal citation
7   omitted). Here, as Plaintiffs point out, their interests in
8   increased fuels treatment are "causally related' to environmental
9   concerns like stand-replacing wildfires which clearly fall within
10  NEPA's rubric. Therefore the Court concludes that Plaintiffs
11  have adequately demonstrated standing.

12      Turning now to NEPA's analytic structure, as indicated above
13  the statutory scheme requires only that federal agencies like the
14  Forest Service establish a consistent process for considering
15  environmental impacts, and take a "hard look" at the consequences
16  of such impacts. Vermont Yankee Nuclear Power v. NRDC, 435 U.S.
17  at 558. So long as "the adverse environmental effects of the
18  proposed action are adequately identified and evaluated, the
19  agency is not constrained by NEPA from deciding that other values
20  outweigh the environmental costs." Id.

21      While NEPA requires an evaluation of environmental effects,
22  it imposes no substantive constraints on the Agency's decision
23  making. Robertson v. Methow Valley Citizens, 490 U.S. at 350 (So long
24  as "the adverse environmental effects of the proposed action are
25  adequately identified and evaluated, the agency is not constrained
26  by NEPA from deciding that other values outweigh the environmental
27  costs"); Salmon River Concerned Citizens v. Robertson, 32 F.3d at 1356
28  (NEPA "does not dictate a substantive environmental result").

NEPA even presumes that agencies will have a preferred action,
requiring only that impacts be evaluated objectively and in good
faith.  See 40 C.F.R. §1502.14(3) (requiring identification of
agency's preferred alternative); Metcalf v. Daley, 214 F.3d 1135,
1142 (9th Cir. 2001) ("NEPA assumes as inevitable an
institutional bias within an agency proposing a project....").

     Judicial review under NEPA cannot extend to the substantive
need for, or desirability of, a particular policy like increased
protection against wildfires or heightened protection for
wildlife.  See Mobil Oil Expl. & Prod. Southeast, Inc. v. United
Dist. Cos., 498 U.S. 211, 230-31 (1991); Vermont Yankee Nuclear
Power Corp. v. NRDC, 435 U.S. at 541-48; Personal Watercraft
Ass'n v. Dept. of Commerce, 48 F.3d 540, 544-56 (D.C. Cir. 1995).
The Constitution reserves such policy decisions for assessment
and determination by the Executive and Legislative branches of
government.

     We now address the specific NEPA shortcomings identified by
Plaintiffs.  As alleged in their Second Cause of Action,
Plaintiffs contend that the 2004 Framework fails to sufficiently
address other alternatives to its chosen approach, and points
specifically to the Forest Service's alleged failure to
adequately consider the utility of reverting to the no-action
alternative reflecting policies in place prior to adoption of the
2001 Framework.  Pls.' Am. Compl., ¶ 30.  In addition, on a more
general basis, Plaintiffs claim that the 2004 Framework fails to
properly analyze the constraints on timber harvesting that it
envisions.  Id. at ¶¶ 31-32.
///

29

1    **A.   Failure to Consider Pre-Framework Management as an**
2         **Alternative in Deciding the Nnew Direction Represented**
          **by the 2004 Framework.**

3

4         According to Plaintiffs, while the 2004 SEIS, as a

5    supplemental document to the original 2001 EIS, purportedly

6    carries forward the alternatives considered in conjunction with

7    the original 2001 Framework, it nonetheless does not revisit

8    consideration of the original "no-action" alternative to

9    implementation of any new plan; namely, retaining the status quo

10   for individual forest plans in place prior to 2001.  Plaintiffs

11   complain that the 2004 SEIS is "largely a comparison of

12   alternatives S1 and S2," which represent a comparison between the

13   2001 Framework and the preferred alternative identified by the

14   Forest Service for adoption in 2004.  See Pls.' Mem. in Support

15   of Mot. for Summ. J., 46:8-12.  According to Plaintiffs, the 2004

16   Framework contains only "scant" discussion of the alternatives

17   originally considered in 2001, including the "no action"

18   alternative identified above.

19        NEPA does require that federal agencies like the Forest

20   Service herein "produce an EIS that rigorously explores and

21   objectively evaluates all reasonable alternatives so that the

22   agency can sharply define the issues and provide a clear basis

23   for choice among options by the decisionmaker and the public to

24   consider alternatives to the proposed action."  Kootenai Tribe of

25   Idaho v. Veneman, 313 F.3d 1094, 1120 (9th Cir. 2002) (citing 40

26   C.F.R. § 1502.14).  As the Ninth Circuit explained, "NEPA

27   regulations describe this alternatives requirement as the 'heart'

28   of the EIS."  Id.

1  An EIS is inadequate for purposes of NEPA if it fails to address

2  "[t]he existence of a viable but unexamined alternative."

3  Natural Res. Def. Council, 421 F.3d at 813.

4      Defendants counter Plaintiffs' argument that the 2001

5  alternatives were not adequately reconsidered by asserting that

6  because the 2004 Framework was by definition a "supplemental"

7  environmental impact statement to the original 2001 version, the

8  consideration of alternatives considered in conjunction with the

9  2001 Framework, including the "no-action" alternative, must

10 necessarily be incorporated by reference in the 2004 version

11 presently under scrutiny.

12     The viability of these arguments has recently been squarely

13 addressed by the Ninth Circuit within the context of a decision

14 overruling this Court's denial of a preliminary injunction sought

15 by Plaintiffs to permit logging within three site-specific

16 proposals (Basin, Empire and Slapjack) approved by the Forest

17 Service for logging.  In Sierra Forest Legacy v. Rey, 526 F.3d

18 1228, (9th Cir. 2008), the Ninth Circuit looked specifically at

19 whether or not the 2004 Framework rigorously explored and

20 objectively evaluated all reasonable alternatives in analyzing

21 whether Plaintiffs had demonstrated a probability of success on

22 the merits for purposes of their entitlement to preliminary

23 injunctive relief.  It unequivocally concluded that the Forest

24 Service "cannot rely on its discussion of alternatives in the

25 2001 FEIS to satisfy its requirement [that reasonable

26 alternatives be evaluated] for the 2004 FEIS." Id. at 1231.

27 ///

28 ///

1    In reaching this conclusion, the <u>Sierra Forest Legacy</u> court
2    reasoned that because the Forest Service altered its modeling
3    techniques between the issuance of the 2001 FEIS and the 2004
4    SEIS but failed to update its analysis of the 2001 FEIS
5    alternatives to reflect these new techniques, changed
6    circumstances were present that rendered improper any reliance by
7    the 2004 Framework on its 2001 predecessor.  <u>Id</u>.  As the court
8    stated, "where changed circumstances affect the factors relevant
9    to the development and evaluation of alternatives," the Forest
10   Service "must account for such change in the alternatives it
11   considers.  <u>Id</u>., citing <u>Natural Res. Def. Council,</u> 421 F.3d at
12   813-14.

13   Given the Ninth Circuit's clear precedent on the very issue
14   presently before this Court, summary adjudication in Plaintiffs'
15   favor must be granted on their argument, as set forth in the
16   Second Cause of Action, that alternatives to the 2004 Framework
17   were not adequately considered.

18

19   **B.   Effects on timber harvest activities.**

20

21   As indicated above, the second prong of Plaintiffs' NEPA-
22   based attack on the 2004 Framework consists of their claim that
23   the Framework violated NEPA by failing to address the changes in
24   timber harvest level and the environmental consequences of those
25   changes.  Pls.' Am. Compl., ¶ 32.
26   ///
27   ///
28   ///

32

1    This argument is misplaced.  The record demonstrates that
2  levels of timber harvest, and its effects on production of
3  commercial forest products, have been discussed in adequate
4  detail in the 2004 Framework SEIS.  <u>See</u> SNFPA 3386-3392.  The
5  SEIS outlines the anticipated production of commercial products
6  under the 2004 Framework along with its expectation that large
7  volumes of sawtimber and other forest products would be
8  generated.  SNFPA 3386, 3390-91.  The SEIS states that the 2004
9  Framework, as opposed to its 2001 predecessor, will permit an
10  increased level of timber harvesting, largely attributable to a
11  "combination of increased acres in group selection in the HFQLG
12  pilot project area and a change from emphasizing prescribed fire
13  under [the 2001 Framework] to providing greater flexibility to
14  select appropriate fuels treatments based on local conditions
15  under [the 2004 Framework]."  SNFPA 3665, 3263.  Anticipated
16  average annual sawtimber harvests are estimated on an annual
17  basis for a period spanning 20 years under levels proposed under
18  both the 2001 and 2004 Frameworks.  SNFPA 3386.  Commercial
19  biomass generated under the directives of the 2004 Framework, as
20  compared to the 2001 version, is also discussed, and the expected
21  volumes produced by each forest is listed.  SNFPA 3390-3391.

22    While Plaintiffs further argue that the 2004 SEIS does not
23  adequately address issues pertaining to ASQ and lands suitability
24  designations, those arguments have already been disposed of
25  above.  In addition, Plaintiffs' contention that the Framework
26  does not describe the socio-economic effects that elimination of
27  specific timber sales programs may have on local communities and
28  businesses also appears to lack merit.

1  The SEIS considers socioeconomic effects in many contexts,

2  including an economic analysis for assessing employment and

3  earning effects.  See SNFPA 3391-92; see also SNFPA 3352

4  (discussing employment trends).  In response to public comments,

5  the Forest Service further addressed issues pertaining to the

6  wood products industry, SNFPA 3695; regional employment, SNFPA

7  3700; and other socio-economic impacts from logging.  SNFPA 3698-

8  3702.   The Court concludes that the SEIS has sufficiently

9  considered both socio-economic and environmental impacts from

10 timber harvest.

11      Although Plaintiffs may disagree with the Forest Service's

12 decision to proceed with 2004 Framework in light of the painful

13 tradeoffs between industry interests and economic concerns, that

14 kind of policy disagreement does not give rise to a NEPA

15 violation.  See, e.g, Northwest Coalition for Alternatives to

16 Pesticides v. Lyng, 844 F.2d 588, 591 (9th Cir. 1988).

17

18 **III. CLAIMS UNDER THE APA THAT DEFENDANTS FAILED TO PROVIDE THE**

19 **     REQUISITE "REASONED ANALYSIS" FOR ADOPTION OF THE 2004**
   **     FRAMEWORK**

20

21      Plaintiffs have reduced the scope of their independent APA

22 challenge to the 2004 Framework, as set forth in the Third Cause

23 of Action, by eliminating the following claims: 1) that the

24 Framework is arbitrary because it does not do enough to

25 accomplish its goal of reducing unnaturally high fuel levels;

26 2) that the Framework arbitrarily seeks to establish too much

27 acreage in so-called Old-Growth Emphasis Areas; and

28 ///

3) that percent allocation to such Old-Growth Emphasis Areas is contrived and arbitrary.  <u>See</u> Pls.' Opp. to Defs.' Mot. for Summ. J., 28:14-16.  That leaves only two remaining APA contentions for disposition by the Court.  First, Plaintiffs claim that the 2004 Framework is improperly based on a defective model in the form of the 2001 Framework.  Second, Plaintiffs allege that the Framework's constraint against harvesting trees greater than 30 inches diameter at breast height ("dbh") is arbitrary.

To the extent that the 2004 Framework represents a significant departure from the policies embodied by its 2001 predecessor, the rationale for that change must be adequately articulated.  As long as the agency provides a procedural explanation for the change of course, the APA is satisfied. <u>Nat'l Cable Tel. Ass'n v. Brand X Internet Servs</u>., 545 U.S. 967, 981 (2005); <u>Springfield Inc. v. Buckles</u>, 292 F.3d 813, 819 (D.C. Cir. 2002).  An agency changing its course must "supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."  <u>See</u> <u>Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 42.  "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the decision made."  <u>Id</u>. at 43.  The standard of review to be employed is not whether an agency's decision is supported by substantial evidence; instead, the Court must uphold a decision for which an administrative hearing is not required unless it is arbitrary or capricious because the requisite reasoned analysis is lacking. ///

1  See 5 U.S.C. § 706(2)(A); Wilderness Soc'y v. Thomas, 188 F.3d

2  1130, 1136 (9th Cir. 1999).

3      In analyzing the propriety of the 2004 Framework, it should

4  also be noted that claims under the APA must be viewed in light

5  of the substantive statutory authority under which the agency

6  acts.  As set forth above, the NFMA requires that the Forest

7  Service "provide for multiple use and sustained yield" of

8  products and services, including "coordination of outdoor

9  recreation, range, timber, watershed, wildlife and fish, and

10  wilderness."  16 U.S.C. § 1604(e)(1).   The case law confirms

11  that forest planning statutes incorporate considerations of

12  multiple use.  Sierra Club v. Espy, 38 F.3d 792, 795 (5th Cir.

13  1994 ).

14      The burden is on Plaintiffs to demonstrate that the Forest

15  Service's action is flawed; otherwise, the agency's action is

16  given a presumption of regularity.  See Clyde K. v. Puyallup

17  School Dist., No. 3, 35 F.3d 1396, 1398 (9th Cir. 1994).  As we

18  have already seen, this confers broad discretion to the Forest

19  Service in its balancing of different resource uses, including

20  timber and wildlife.  Such discretion permits the Forest Service

21  to determine the mix of uses that best suits the public interest.

22  See 16 U.S.C. § 529 (directing Secretary of Agriculture to

23  administer the National Forest Service for multiple uses and

24  sustained yield); Perkins v. Bergland, 608 F.2d 803, 806 (9th

25  Cir. 1979) (the mandate to manage for multiple uses "'breathe[s]

26  discretion at every pore.'" (citation omitted);  Intermountain

27  Forest Ass'n v. Lyng, 683 F. Supp. 1330, 1337-38 (D. Wyo. 1988).

28  ///

36

1    Discretion in managing for multiple use is reflected in

2   pertinent forest management statutes and is also incorporated

3   into the forest planning.  Where the factual issue concerns an

4   opinion or judgment on some environmental or silvicultural

5   matter, on such a "scientific determination.... a reviewing court

6   must generally be at its most deferential."  Baltimore Gas &

7   Elec. Co. v. Natural Resources Def. Council, 462 U.S. 87, 103

8   (1983).  An "agency must have discretion to rely on the

9   reasonable opinions of its own qualified experts even if, as an

10   original matter, a court might find contrary views more

11   persuasive."  Marsh v. Oregon, 490 U.S. 360, 378 (1989).

12    In light of that analytical approach, and particularly the

13   discretion that must be accorded to the Forest Service's judgment

14   on how to best accommodate competing multiple-use objectives

15   within forest planning, we turn to the specific APA shortcomings

16   identified by Plaintiffs.

17

18    **A.   Flawed Adoption of the 2004 Framework.**

19

20    Plaintiffs argue that the 2001 Framework is flawed, and that

21   the 2004 Framework is similarly improper since it is based on the

22   flawed model of its 2001 predecessor.  Plaintiffs generally claim

23   that both Frameworks are arbitrary and capricious because they

24   make wildlife habitat dominant over other multiple-use

25   objectives, particularly timber production.  That contention has

26   already been rejected earlier in this Order.

27   ///

28   ///

1  Plaintiffs also argue, however, that the 2004 Framework fails to

2  go far enough in producing fire-resistant and resilient

3  ecosystems because it is not sufficiently aggressive in reducing

4  the risk of fire damage.  See Pls.' Am. Compl., ¶ 36.

5       The Forest Service's adoption of the 2004 Framework in the

6  face of the numerous challenges it faced cannot be considered

7  arbitrary and capricious.  Contrary to Plaintiff's contention,

8  the record does contain support for the Forest Service's

9  conclusion that the 2004 Framework would better address fire and

10 fuels concerns than its predecessor.  The Management Review Team

11 (assembled by the Regional Forester to address specific concerns

12 raised by the Forest Service following adoption of the 2001

13 Framework) evaluated the fuels strategy encompassed in the 2001

14 Framework and identified three critical areas meriting

15 improvement.  SNFPA 3100-3101.  First, the Team identified the

16 need for fuel treatments to be strategically placed across the

17 landscape.  Secondly, the group recommended that enough material

18 be removed to ensure that wildfires burn at lower intensities and

19 slower speeds in treatment areas.  Finally, the Management Review

20 Team recognized the need for cost efficient reduction measures

21 that would allow program goals to be accomplished within the

22 confines of appropriated funds.  Id.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1    The 2004 Framework, in response to those suggestions,
2  provides more flexibility to strategically locate treatments
3  across the landscape.  SNFPA 3290, 3291.  Because the 2004
4  Framework does not restrict the location of mechanical treatments
5  as much as the 2001 ROD, fire behavior can more effectively be
6  modified than under the 2001 Framework, which dramatically
7  limited such treatments in many areas.  See SNFPA 2995; 3290,
8  3291 (comparing rate of spread, flame length, scorch height, and
9  projected mortality).  The 2004 Framework also results in the
10 removal of more hazardous fuels, making mechanical treatment more
11 effective.  See SNFPA 3290 (noting that the effectiveness of
12 mechanical treatments under the 2001 ROD was "greatly
13 compromise[d]" by the fact that 30 percent of the acreage
14 treatment was limited to removing trees less than six inches in
15 diameter).  Finally, the increased cost efficiency of the 2004
16 Framework is illustrated by the fact that while its more
17 comprehensive treatment objectives would be higher and cost more
18 to implement, it would also generate 3.5 times more revenue
19 annually to offset the higher costs necessary to more effectively
20 reduce fire risk to the landscape.  See SNFPA 3293-94.  The fact
21 that the 2004 Framework addressed the concerns voiced by the
22 Management Review Team with regard to its 2001 predecessor
23 provides a reasoned basis for changing the Forest Service's
24 approach to fire and fuels management, thereby satisfying the
25 APA.
26 ///
27 ///
28 ///

1    In addition, it was reasonable for the Forest Service to
2  choose a treatment option that, after a decade of implementation,
3  would result in fewer acres experiencing stand-replacing[8]
4  wildfires.  See SNFPA 3287, 3288.  Significantly, too, the
5  management review team also identified numerous practical
6  difficulties in implementing the 2001 Framework in any event.  It
7  identified difficulties in classifying vegetation at the small
8  (one-acre increment) scale required by the 2001 ROD that made it
9  subject to inconsistent classification.  See SNFPA 1947, 3290-01,
10  3612.  It further found that the 2001 Framework relied upon
11  relatively small discrepancies in canopy cover that were
12  difficult to consistently measure with any precision.  SNFPA
13  1946-48.  Importantly, also, more than 80 percent of district
14  rangers responding to a survey reported that 2001 Framework
15  standards and guidelines prevented effective treatment.  SNFPA
16  1928, see also SNFPA 2995.

17    It must further be emphasized that there is adequate support
18  in the record for the proposition that the 2004 Framework would
19  better meet the Forest Service's goal of moving forest landscapes
20  towards a natural fire regime which, in the long run, would
21  result in more effective fuels treatment.  See SNFPA 3287, 3288
22  (Table 4.2.4a, Figure 4.2.4b).

23  ///

24  ///

25  ///

26

27    [8] A stand-replacing fire is one where most or all vegetation
28  is killed, thereby destroying associated habitat for existing
species.  See SNFPA 3287.

The Sierra Nevada faces a situation where nearly 8 million of the 11.5 million acres that comprise national forests in the region are in vegetation condition classes that pose moderate to high risks from wildland fires. SNFPA 2998.[9]   The proliferation of smaller, less fire-resistant tree species (which under natural conditions had kept in check by widespread, low severity fires) has created a highly-combustible fuel bed, as well as a fire ladder serving to carry ground fire into the crowns of larger trees.   Given that potential tinderbox, it was reasonable for the Forest Service to explore and adopt measures to more effectively address fire danger by reducing the understory of smaller and less desirable vegetation.   The 2004 Framework points out that the magnitude of this increasing danger has been borne out by devastating fires throughout the Western United States in recent years that has occasioned an "unacceptable loss of life, property and critical habitat" calling out for a more effective alteration of current forest conditions.   Id.

        Given such conditions, it was understandable that the current Administration felt less comfortable with the 2001 approach of fighting "fire with fire", which relied more heavily on prescribed burning to reduce overly-dense forests with the hope those fires did not get out of control.

///

_____

        [9] This acreage has been denoted as falling within Classes 2 and 3, which represent areas where fire regimes have been so altered from their historic range of fire return interval that they are at "moderate risk of losing key ecosystem components" due to wildland fire (Class 2) and areas which are at "greatest risk of ecological collapse" because it has been so long since fire operated as a process in the ecosystem.   Id.

This constituted a rational basis for moving, as the 2004
Framework did, to greater reliance on mechanical methods for
thinning overly dense forests.  SNFPA 2995.

At the same time, much of the increased fuel treatments
entailed within the 2004 Framework were attributable to full
implementation of the HFQLG Act Pilot Project, which, as stated
above, represented a congressional mandate to test the efficacy
of improved fires suppression through a combination of fire
breaks, group selection logging and individual logging.  SNFPA
1918.  The Management Review Team found that the 2001 ROD
"severely limit[ed]" implementation of the HFQLG Pilot Project,
as it did not allow the full extent of group selection envisioned
by the HFQLG Act.  SNFPA 1967, 1970.  Experimentation with such
techniques is a valuable tool in refining adaptive management
techniques, whereas the 2001 Framework's more passive approach
reduced the ability to experiment and obtain information.  See
SNFPA 3001-02, 3139-43.  Such experimentation is anticipated by
the provisions of the NFMA (16 U.S.C. § 1604(g)(3)(C), and the
management review team concluded that a new direction could more
thoroughly test group selection and better fulfill the goals of
the HFQLG Act.  SNFPA 1967, 1970; see also SNFPA 3002.

In addition to finding that the impacts to the California
spotted owl occasioned by full implementation of the Pilot
Project were less than originally believed (as discussed in more
detail, infra), the Team also found that the community stability
goals of the HFQLG Act were not being met.

///

///

42

1   See SNFPA 1967, 1968 (a "key component" of the Pilot Project is

2   to "provide socio-economic benefit through timber and biomass

3   production, and therefore enhance community stability in the

4   project area."); SNFPA 1969, 1970 (the community stability, and

5   socio-economic aspects of the Pilot Project are not being

6   implemented"); SNFPA 3001.  See SNFPA 3386, 3697 ("Alternative S2

7   is designed to better meet[] the goals envisioned by the Pilot

8   Project and will contribute toward producing socio-economic

9   benefits of enhancing community stability in the pilot project

10  area.").  Timber production is a legitimate objective in national

11  forest management and is one of the competing resources the

12  Forest Service is responsible for managing.

13      Because the record contains adequate support for the

14  conclusion that the 2004 Framework would more effectively reduce

15  landscape fuels, would better protect communities from the risk

16  of catastrophic wildfire, and would further permit fulfillment of

17  the legitimate objectives of the congressionally mandated HFQLG

18  Act, the change in resource use and emphasis represented by the

19  2004 Framework's provisions concerning fuels and fire managements

20  was well within the agency's statutory discretion and

21  consequently do not run afoul of the provisions of the APA.  By

22  revisiting the unnecessary assumptions of the 2001 Framework and

23  by better providing for community stability, the Forest Service

24  decided upon a different resource balance that would address both

25  the needs of wildlife and the duty under the HFQLG Act to fully

26  implement the Pilot Project.  See SNFPA 3338-39, 3608-09.

27  ///

28  ///

In adopting the 2004 Framework, the Forest Service had the policy discretion to provide more or less emphasis to any given resource or interest, so long as essential protections were afforded.  In managing forests, every decision involves tradeoffs among competing use values and the competing interests of different species.  Sierra Club v. Espy, 38 F.3d at 800-02.  As stated above, while much of the Sierra Nevada is in a dangerously overstocked condition, not all eight million acres that are at moderate to high risk can be treated at the same time.  See SNFPA 3289.  It was reasonable for the Forest Service to emphasize treatment in areas with closest proximity to human dwellings and communities.

The policy values the Forest Service emphasized to a greater extent in the 2004 Framework were not arbitrary or capricious so as to violate the APA.  Those policy choices are within the Forest Service's "wide discretion to weigh and decide proper" multiple uses under the NFMA and MUSYA.  Big Hole Ranchers Ass'n v. U.S. Forest Serv., 686 F. Supp. at 264.  Such multiple use determinations involve the weighing of both technical policy concerns and scientific methodologies, functions in which this Court should ordinarily not interfere.  See, e.g., The Lands Council v. McNair, 537 F.3d at 988 (explaining that choosing between competing scientific approaches is not a "proper role for the court").  Instead, deference should be afforded to the Forest Service, and its methodological choices, in making the hard choices necessary for forest management.  Id. at 991.

///

///

44

1      **B.   Constraints on Logging Large Trees.**

2

3      Plaintiffs' remaining APA contention lies in the argument

4  that the 2004 Framework's general prohibition against harvesting

5  trees more than 30 inches dbh is "unexplained, and hence,

6  arbitrary."  Pls.' Mem. in Support of Mot. for Summ. J., 37:14-

7  15; See Pls.' Am. Compl., ¶ 38.

8      The record does not bear out Plaintiffs' claim in this

9  regard.  The SEIS explains that the retention of larger trees is

10 needed to provide habitat for old-forest species like the

11 California spotted owl, the American marten and the Pacific

12 fisher.  See, e.g., SNFPA 3348, 3602, 3615.  The Forest Service

13 expressly considered diameter limits in light of the 2001

14 Framework's more restrictive diameter limits and concluded that

15 mandating smaller limits reduced managers' ability to design and

16 implement cost-efficient fuel treatments in the face of marginal

17 contributions to objectives like canopy cover needs.  SNFPA 3163,

18 1928.  All this suggests that tree harvesting diameter limits was

19 a reasonable decision meriting deference.  Courts "defer to

20 agency expertise on questions of methodology unless the agency

21 has completely failed to address some factor..."  Inland Empire

22 Pub. Lands Council v. Schultz, 992 F.2d 977, 981 (9th Cir. 1993)

23 (citation omitted).  No such indication is present here.

24 ///

25 ///

26 ///

27 ///

28 ///

**CONCLUSION**

Based on the foregoing, and following careful review and consideration of the parties' Cross Motions for Summary Judgment in this matter, the Court GRANTS Defendants' Motion for Summary Judgment with the exception of the NEPA claim for failure to consider reasonable alternatives to the 2004 Framework as required by NEPA.[10]  Summary adjudication as to that claim, which is contained within the Second Cause of Action, is GRANTED in favor of Plaintiffs.

As requested by the parties, remedies issues with regard to Plaintiffs' Second Cause of Action shall be adjudicated following further briefing.  The parties are directed to propose a briefing schedule to the Court for its consideration not later than ten (10) days following the date of this Memorandum and Order.

IT IS SO ORDERED.

Dated: September 23, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[10] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).

46